THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CECELIA B.  RILEY, | ) | 7:06CV5013 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| TYSON FRESH MEATS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Cecelia Riley ("Riley") has alleged that her former employer, defendant Tyson Fresh Meats, Inc. ("Tyson"), discriminated against her based on her national origin, age, and race when she was terminated from her employment.  *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17; Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634; 42 U.S.C. § 1981.  Tyson has filed a motion for summary judgment (filing 38) on all of Riley's claims.  For the reasons set forth below, I shall grant Tyson's motion.

## I.  UNDISPUTED MATERIAL FACTS

### A.  *Riley's Employment at Tyson*

1.     Cecelia Riley, a Hispanic woman born on October 9, 1952, began working at IBP's Lexington, Nebraska, meat packing plant on August 3, 1999, as a production line worker.[1]  (Complaint, Filing 1 at ¶ 5; Affidavit of Marcia Washkuhn ("Washkuhn Aff.") ¶ 2, Ex. A; Deposition of Cecelia Riley ("Riley Depo.") at 8:17-

---

[1]In 2001, IBP merged with Tyson.  (Riley Depo.  at 91:8-19.)  For consistency, Ms. Riley's employer will be referred to herein as "Tyson."

18; 92:2-25; 94:14-16.)

2.      After working on the production line for approximately six months, Riley began experiencing wrist problems and was placed on light duty. (Riley Depo. at 94:17-95:22; 105:1-10.)

3.      While Riley was on light duty, she was assigned to the employment office to help interpret for Hispanic persons and to perform occasional filing. (Riley Depo. at 94:17-95:22; 100:8-103:9.)

4.      After two to six months of helping to interpret in the employment office, Riley applied for the employment clerk position that was being vacated by Mary McIntosh due to McIntosh's retirement. (Riley Depo. at 98:23-99:16; 103:10-21; 105:1-10.)

5.      McIntosh worked as the employment clerk from approximately December 1990 or January 1991 to May 20, 2000, the date of her retirement. (Declaration of Suzann Ekberg ("Ekberg Decl.") ¶ 4; Riley Depo. at 103:10-21.) McIntosh's date of birth is June 4, 1946. (Ekberg Decl. ¶ 5.) McIntosh was 53 years old when she retired from Tyson. (Ekberg Decl. ¶ 5.) In her position as the employment clerk, McIntosh did not receive any disciplinary action for poor performance. (Ekberg Decl. ¶ 6; Riley Depo. at 104:3-14.)

6.      The employment clerk job posting described the following job duties and responsibilities:

> MUST BE ABLE TO CORRECTLY AND SKILLFULLY FILL PAPERWORK FOR ALL NEW HIRES, TERMS, OCS AND VVS EMPLOYEES
> BE ABLE TO BE DIVERSE WHEN SHIFT CHANGE OCCURS

2

> BE WILLING/ABLE TO LEARN TO DISTINGUISH BETWEEN
>   GOOD/BAD DOCUMENTS
> CONFIDENTIALITY A MUST

(Riley Depo. at 114:15-115:10; Ex. 17.)

7.     The job posting also included the minimum qualifications for consideration:

> HIGH SCHOOL DIPLOMA OR EQUIVALENT
> PREFER PREVIOUS CLERICAL EXPERIENCE
> PREFER FAMILIARITY WITH IBP OPERATIONS
> EXCELLENT ATTENDANCE NECESSARY
> PREFER KEYBOARDING EXPERIENCE
> GENERAL OFFICE DUTIES/ABILITY TO LEARN/PERFORM
>   TASKS WITH LITTLE SUPERVISION
> TYPING, FILING, PHONE WORK, COMPUTER SKILLS
> MUST BE ABLE TO WORK WELL WITH OTHERS

(Riley Depo. at 114:15-115:10; Ex. 17.)

8.     Riley applied for the employment clerk position and interviewed with Canda Montgomery, the Employment Office Manager, and Jesus Colunga, the Assistant Personnel Manager and a Hispanic male. (Riley Depo. at 119:5-120:7; Ex. 15.)

9.     Montgomery offered the employment clerk position to Riley, and effective June 5, 2000, Riley assumed the employment clerk responsibilities. (Riley Depo. at 105:19-107:16; 119:5-15; Ex. 15.)

10.     Riley's employment clerk job duties included, but were not necessarily limited to, processing records and employment for new hires, monitoring and processing I-9 expiration lists, filing terminated employee files, answering telephones, and scheduling interview appointments. (Riley Depo. at 113:5-114:14; Ex. 16.)

11.     Riley's desk was located at the front of the employment office because, as part of her job duties, she was required to meet and greet people entering the office. (Riley Depo. at 129:7-19.)

12.     Meeting and greeting people is an essential job function specific to the employment clerk position, and to perform this essential job function, the employment clerk must sit at the front of the employment office. (Riley Depo. at 129:7-19; 131:3-16.)

13.     The employment clerk position was the first employment-related position Riley had ever held, and, before the position, she lacked any previous experience in processing employment applications and immigration paperwork, and experience in hiring and recruiting employees. Riley also lacked any education or formal training in performing clerical duties. (Riley Depo. at 13:21-23; 15:14-24; 127:4-128:5.)

14.     Riley has been terminated due to poor performance from four other clerical positions she has held. (Riley Depo. at 24:19-25:15; 38:23-40:2; 52:2-55:12.)

15.     The employment office employed only three employees: Canda Montgomery, Mary Woltemath, and Riley. (Riley Depo. at 123:21-124:4.)

16.     Ms. Montgomery, the Employment Office Manager, supervised both Riley and Ms. Woltemath, and Montgomery had an office at the back of the employment office. (Riley Depo. at 119:19-24; 128:6-15.)

4

17.     Woltemath, a Caucasian woman born on November 6, 1955, was the Assistant Employment Manager.  (Riley Depo. at 122:4-7; Ekberg Decl. ¶ 7.)  As the Assistant Employment Manager, Woltemath had different job responsibilities than Riley.  (Riley Depo. at 122:8-123:6.)  Woltemath had a small office in the middle of the employment office.  (Riley Depo. at 128:10-15.)

18.     Riley admits she has no evidence to indicate that, in her position as Assistant Employment Manager, Woltemath made mistakes or errors, nor does she have evidence of specific errors or mistakes by "any personnel office or other clerks or employees that [the plaintiff is] comparing [herself] to" or by "other individuals that [the plaintiff has] identified as comparators in this case."  (Riley Depo. at 275:18-276:13.)

19.     Riley claims she was "treated a little bit different" than "the younger girls in the personnel office."   (Riley Depo. at 274:1-2.)   The personnel office employed clerks, but these clerk positions differed from Riley's position in that they had different job titles and different job responsibilities.   They also worked in a different office and reported to a different supervisor than Riley.  (Riley Depo. at 273:21-276:13.)

### B .  Riley's Deficient Work Performance[2]

20.     On or about May 23, 2000, only one or two weeks after Riley had assumed the employment clerk job duties following McIntosh's retirement, Montgomery discussed several performance issues with Riley, including (1) a complaint that Riley had engaged in inappropriate conduct, including being present

---

[2]Riley does not object to the accuracy of the defendant's recitation of undisputed facts in paragraphs 20 to 43 below, but claims that the constant scrutiny of her work performance, as described in these paragraphs, constitutes discrimination.  (Filing 42, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 3.)

in the office on at least two or three Saturdays with the lights off and with a gentleman; (2) Riley's work hours; (3) Riley's inability to handle several things at once; (4) Riley's inability to ask for help when necessary; (5) instructions that Montgomery must clear all decisions made during Riley's probation period; and (6) instructions that Riley was not to telephone McIntosh at home to ask how to do her job. (Riley Depo. at 193:8-197:6; Exs. 22 & 23.) Although this counseling did not result in any formal disciplinary action, Montgomery advised Riley that she would receive a written warning for any further incidents. (Riley Depo. at 194:4-7; 197:7-16; Ex. 22.)

21.    On or about June 10, 2000, Montgomery met with Riley to discuss numerous clerical errors made by Riley. (Riley Depo. at 197:17-25; Ex. 24.) Riley admits she made the errors. (Riley Depo. at 198:1-10.) This counseling did not result in any formal disciplinary action. (Riley Depo. at 198:11-19.)

22.    On June 26 or 27, 2000, Montgomery met with Riley to discuss her performance deficiencies. (Riley Depo. at 198:20:199:9; Ex. 25.) Riley admits she made the errors. (Riley Depo. at 199:10-19.) This counseling did not result in any formal disciplinary action. (Riley Depo. at 199:20-25.)

23.    On or about July 5, 2000, Riley received her first formal disciplinary action in the form of a written counseling regarding her failure to (1) list applicants on the appropriate log; (2) make up new hire logs for departments; (3) follow-up on I-9 forms; (4) file appropriately; and (5) make appropriate copies of new hire processing paperwork. (Riley Depo. at 200:1-16; Ex. 26.) Riley admits she made these errors. (Riley Depo. at 200:17-25; 202:4-9.)

24.    On or about December 6, 2000, Montgomery completed a job performance evaluation for Riley. (Riley Depo. at 202:10-16; Ex. 28.) The evaluation noted several areas in which Riley needed improvement, including:

- following through with each task;
- adding additional job assignments as she learned her current duties;
- learning aspects of her position, such as computer input and Basic Pilot program[3];
- using courtesy in asking for assistance from co-workers;
- decision making;
- using courtesy toward applicants;
- taking initiative to complete projects instead of leaving them for someone else to finish; and
- following through and completing multiple tasks at the same time.

(Riley Depo. at 202:17-204:8; Ex. 28.)  The evaluation also noted that Riley had not attained her goals to have no I-9 or W-4 form errors.  (Riley Depo. at 204:9-17; Ex. 28.)

25.     On or about February 3, 2001, Montgomery counseled Riley for errors relating to copies of I-9s and W-4s.  (Riley Depo. at 205:3-206:3; Ex. 29.)  Riley admits she was counseled at various times during her employment about errors in failing to properly maintain applications, failing to make appropriate copies of I-9s or W-4s, and failing to pull certain documents.  (Riley Depo. at 205:3-206:3.)

26.     On or about March 23, 2001, Riley was counseled about complaints that she was eating in the employment office with her boyfriend outside of working hours. (Riley Depo. at 206:4-207:16; Ex. 30.)  Riley admits that she ate in the employment office with her boyfriend outside of working hours, and that a security guard asked her not to have anybody join her in the employment office outside of working hours. (Riley Depo. at 206:17-207:9.)   This counseling did not result in any formal disciplinary action.  (Riley Depo. at 207:17-20.)

---

[3]The Basic Pilot program was used to verify employment eligibility.  (Riley Depo. at 153:24-156:1.)

27.    On or about May 9, 2001, Riley made a written complaint about her work environment, in which she specifically complained about Woltemath and an interpreter.  (Riley Depo. at 207:21-208:15; Ex. 31.)  Riley's written complaint did not complain about Montgomery; to the contrary, Riley praised Montgomery:

> . . . . I observed Canda M. very professional—in fact I admired her how she handled/conducted her affairs.  A bright intelligent lady.  Later she became to let her hair down when Alma showed up in the office.  Canda began to draw near to us.  Inquisitive, etc.

(Ex. 31.)

28.    On or about May 10, 2001, as part of an investigation into Riley's written complaint about her co-workers, Montgomery requested written statements from Riley's co-workers, including Woltemath, a nurse, the nurse manager, and an interpreter.  (Riley Depo. at 208:16-209:24; Exs. 32-35.)  Montgomery and Cleon Hanson, the Personnel Director, advised the individuals involved to get along and to do their jobs. (Riley Depo. at 211:11-24; Ex. 36.)  Riley was not formally disciplined for any of the complaints made in May 2001.  (Riley Depo. at 211:25-212:9.)

29.    On or about June 28, 2001, Hanson counseled Riley about a report that she had told people she would get them hired at Tyson if they paid her $150.00. (Riley Depo. at 212:19-213:12; Ex. 37.)  This counseling did not result in any formal disciplinary action.  (Riley Depo. at 213:13-20.)

30.    On or about October 9, 2001, Montgomery completed a job performance evaluation for Riley.  (Riley Depo. at 216:2-218:10; Ex. 40.)  The evaluation noted several areas in which Riley needed improvement, including:

- leadership skills;
- following through on projects and tasks until completion;

8

- working with fellow employees;
- asking for guidance when necessary;
- prioritizing to ensure completion in a timely manner; and
- ensuring "her integrity is above question."

(Riley Depo. at 216:2-218:10; Ex. 40.)

31.     On or about October 11, 2001, Riley was counseled about a complaint that Riley had treated an applicant rudely.  (Riley Depo. at 213:21-214:9; Ex. 38.) This counseling did not result in any formal disciplinary action.  (Riley Depo. at 214:10-14.)

32.     On or about December 31, 2001, Riley received a written warning with suspension for misconduct.  (Riley Depo. at 214:15-215:19; Ex. 39.)  Riley was disciplined because she took identification photos of a person not employed by Tyson so the person could get a pass allowing him to go back and forth to Mexico.  (Riley Depo. at 215:9-19; Ex. 39.)  Riley admits she took the identification photo.  (Riley Depo. at 215:20-216:1.)  The written warning and suspension advised Riley that a future violation would result in discipline up to and including discharge.  (Ex. 39.)

33.     On or about June 7, 2002, Montgomery evaluated Riley's performance from October 1, 2001, to April 1, 2002.  (Riley Depo. at 222:3-17; Ex. 43.)  The evaluation noted several areas needing improvement, including:

- prioritizing to ensure completion of all work load;
- communicating and cooperating with team members;
- gaining her supervisor's confidence, as "Cecelia's honesty has been questioned several times in the past year";
- learning the remainder of her job duties; and
- performing multiple tasks.

(Ex. 43.)  The evaluation also established four goals: (1) keep I-9 backup file current;

9

(2) complete term sheet by each Friday; (3) complete morning physical paperwork by noon each day; and (4) learn Basic Pilot program by October 1, 2002. (Riley Depo. at 224:14-225:5; Ex. 43.)

34.  On or about November 8, 2002, Montgomery evaluated Riley's performance from April 1, 2002, to October 1, 2002. (Riley Depo. at 228:21-23; Ex. 45.) The evaluation noted several areas needing improvement, including:

- gaining fellow team members' respect, as "Cecelia's integrity has been questioned";
- staying focused on response time and team member needs; and
- communicating with team members and superiors.

(Riley Depo. at 230:6-231:2; Ex. 45.) The evaluation also established four goals for Riley to meet by April 1, 2003: (1) keep I-9 backup file current; (2) learn Basic Pilot program; (3) become more efficient on the computer; and (4) complete morning physical paperwork by noon each day. (Ex. 45.)

35.  On or about January 15, 2003, Riley received a written warning for allowing another team member to use Riley's computer login identification. (Riley Depo. at 231:3-13; Ex. 46.) Riley admits she allowed somebody to use her computer and login information. (Riley Depo. at 231:19-23.) The written warning stated that a future violation would result in discipline up to and including discharge. (Ex. 46.)

36.  On or about May 16, 2003, Montgomery evaluated Riley's performance from October 1, 2002, to April 1, 2003. (Riley Depo. at 241:7-21; Ex. 51.) The evaluation noted several areas needing improvement, including:

- performing quality work ("Cecelia has not been performing quality work");
- multi-tasking to increase quantity;

- staying focused on response time and team member needs;
- showing initiative to contribute to the team effort;
- communicating with other departments;
- prioritizing and planning to get all work done each day;
- using the information she has learned to help herself; and
- computer knowledge.

(Ex. 51.)  Riley admits she needed to improve her performance.  (Riley Depo. at 241:22-242:15.)  The evaluation also established three future goals for Riley: (1) learn Basic Pilot program by October 1, 2003; (2) complete morning physical paperwork by noon each day; and (3) become more efficient on the computer by attending a refresher course or computer class.  (Ex. 51.)

37.     On or about May 29, 2003, Riley received a formal counseling for failing to inform Montgomery of a discrepancy causing an employee to be entered into the computer system incorrectly.  (Riley Depo. at 232:17-234:13; Ex. 47.)  Riley admits she failed to inform Montgomery of the discrepancy.  (Riley Depo. at 232:17-235:3.)  The counseling advised Riley that future violations would result in discipline up to and including discharge.  (Ex. 47.)

38.     On or about June 23, 2003, Riley received a written warning for lack of organization, and she was cautioned about asking for too many employment authorization documents.  (Riley Depo. at 235:4-15; 236:24-237:18; Ex. 48.)  Riley admits she made the errors.  (Riley Depo. at 237:14-18.)  The written warning advised Riley that future violations would result in discipline up to and including discharge.  (Ex. 48.)

39.     On or about July 3, 2003, Riley received a verbal warning for not completing the self ID forms as required.  (Riley Depo. at 237:19-240:9; Ex. 49.)  Riley admits she did not maintain the self ID filing.  (Riley Depo. at 239:21-240:9.)  The verbal warning advised Riley that future violations would result in discipline up

to and including discharge.  (Ex. 49.)

40.    On or about October 28, 2003, Montgomery evaluated Riley's performance from April 1, 2003, to September 30, 2003.  (Riley Depo. at 242:16-22; Ex. 52.)  The evaluation noted several areas needing improvement, including:

- "Cecelia has not been performing quality work.  We have had trouble finding active applications lately";
- improving organization "to eliviate [sic] lost applications"; and
- solving problems on her own without asking for help.

(Ex. 52.)  Riley admits she made errors and needed to improve her work performance.  (Riley Depo. at 243:3-10.)  The evaluation also established five future goals for Riley to meet by April 1, 2004: (1) learn Basic Pilot program; (2) compile all self ID sheets for hired team members within one week of their start date; (3) attend computer class or refresher course; (4) complete weekly audit on Mondays to ensure no errors; and (5) complete morning physical paperwork by noon each day.  (Ex. 52.)

41.    On or about November 14, 2003, Riley received a written warning with suspension for unacceptable work performance.  (Riley Depo. at 225:6-228:20; Ex. 44.)  Specifically, she had lost applications and failed to file an application as requested.  (Riley Depo. at 225:20-228:5; Ex. 44.)  Riley admits she made these errors.  (Riley Depo. at 228:6-20.)  The written warning and suspension advised Riley that future violations would result in discipline up to and including discharge.  (Ex. 44.)

42.    On or about April 14, 2004, Montgomery evaluated Riley's performance from October 1, 2003, to March 31, 2004.  (Riley Depo. at 244:11-246:23; Ex. 53.)  The evaluation noted several areas needing improvement, including:

- work quality ("She is still struggling with consistent errors");

12

- •      customer satisfaction with a quick turnaround;
- •      showing initiative;
- •      getting work done in a timely manner;
- •      follow-up; and
- •      problem solving.

(Ex. 53.)  The evaluation also established five future goals for Riley to meet by October 1, 2004: (1) learn Basic Pilot program; (2) compile all self ID sheets for hired team members within one week of their start date; (3) complete weekly audit on Mondays to ensure no errors; (4) learn incoming and outgoing mail process; and (5) learn new hire process in SAP[4] Administration.  (Ex. 53.)

43.     On or about May 6, 2004, Riley received a written warning with suspension for failing to have current self ID sheets for hires.  (Riley Depo. at 246:24-247:10; Ex. 54.)  Riley's failure to maintain current self ID sheets[5] was a problem for which Riley had been previously disciplined or counseled, and Riley admits to failing to keep self ID sheets current for all hires.  (Riley Depo. at 247:7-16.)  The written warning and suspension advised Riley that future violations would result in discipline up to and including discharge.  (Ex. 54.)

## C. Riley's Termination

44.     On or about September 21, 2004, an applicant filled out an application for a maintenance position at Tyson, took the maintenance test, and failed.  (Riley

---

[4]The SAP Computer System is the computer system Tyson used to track applicant information.  (Riley Depo. at 166:19-22.)  Tyson implemented the SAP Computer System in 2003.  (Riley Depo. at 166:25-167:2.)

[5]Self ID sheets (also called tear sheets or affirmative action sheets) are optional questionnaires attached to employment applications on which applicants may voluntarily provide information such as their national origin or race.  (Riley Depo. at 134:15-135:9.)

Depo. at 247:17-249:8; Ex. 55.)  After the applicant failed the maintenance test, Riley left the applicant in the employment office to review his test and the answer sheet, but warned him that he was not allowed to leave.  Riley "believe[s]" she advised one of her fellow employees that she "needed to step out" before she did so.  (Riley Depo. at 249:4-22.)  When Riley returned, she found that the applicant had left and the application and answer key were missing.  (Riley Depo. at 249:23-250:15.)

45.    Riley cannot remember whether she entered into the SAP Computer System the fact that the applicant had not passed the test.  (Riley Depo. at 250:20-252:22.)  Riley notified Woltemath that she could not locate the test and answer sheet. (Riley Depo. at 250:9-15.)[6]

46.    Under Tyson's policy, if an applicant does not pass the maintenance test, he or she may not reapply for 30 days.  (Riley Depo. at 247:17-248:17; Ex. 55.)

47.    Less than one week later, on or about September 27, 2004, the same applicant attempted to reapply for a job at Tyson.  Riley checked the computer to see whether the applicant had previously applied to work at Tyson.  After seeing that he had, Riley asked the applicant whether he had applied to work at Tyson before, and the applicant told her it had been "several years ago."  Riley admits that she failed to "go into another window or menu" to confirm what the applicant had told her.  The applicant then took the maintenance test, passed, and was eventually hired.  (Riley Depo. at  253:5-256:9; Ex. 55.)

48.    Based on Riley's acceptance of an application and maintenance test

---

[6]Citing "Riley Depo. at 252:6-21," Tyson claims that Riley "failed to notify Ms. Montgomery that she could not locate the test or the application."  (Filing 39, Def.'s Br. Supp. Mot. Summ. J. at 14.)  However, page 252 of the deposition is not included in the evidence submitted to the court.

twice within 30 days, and her "job performance" deficiencies, Riley was terminated. (Ex. 55.)

## II.  DISCUSSION

### A.  *Standard of Review*

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.  *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'"  *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).  "A mere scintilla of evidence is insufficient to avoid summary judgment."  *Id.*  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

15

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

Summary judgment is disfavored in employment discrimination cases, as such cases are "'inherently fact-based.'" *Mayer v. Nextel West Corp.*, 318 F.3d 803, 806 (8th Cir. 2003) (quoting *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999)). Nonetheless, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of his case. *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005).

## B.  Riley's Discharge

There is no direct evidence that Tyson's decision to terminate Riley was based on her national origin, race, or age. Consequently, Riley's discrimination claims will be analyzed using the familiar three-step, burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). *See Johnson v. AT&T*

16

*Corp.*, 422 F.3d 756, 761 (8th Cir. 2005) (applying *McDonnell Douglas* framework to both Title VII and § 1981 discrimination claims); *Roxas v. Presentation Coll.*, 90 F.3d 310, 315 (8th Cir. 1996) ("Although the *McDonnell Douglas* method of analysis arose in the context of Title VII, we have applied its burden-shifting framework to cases arising under the ADEA and § 1981.").

Under the *McDonnell Douglas* framework, a plaintiff first must establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the action. If the defendant does so, the plaintiff must offer evidence showing that the defendant's legitimate reason is merely a pretext for intentional discrimination. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).

To prevail on her national origin and race discrimination claims, Riley must establish that (1) she belongs to a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of unlawful discrimination. *Johnson*, 422 F.3d at 761. In order to prove age discrimination, only the fourth element of this formula changes—replacement by an individual "sufficiently younger to permit the inference of age discrimination." *Hammer v. Ashcroft*, 383 F.3d 722, 726 (8th Cir. 2004) (internal quotation marks and citation omitted). It is undisputed that Riley can prove the first and third elements of her prima facie case of discrimination.

As to the second element, the Court of Appeals in *Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir. 2006) acknowledged that it has not consistently articulated the second element of a prima facie case of discrimination under *McDonnell Douglas*. *Compare Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006) (plaintiff's burden to prove that "she was meeting the legitimate expectations of her employer") *with Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005) (plaintiff's burden to prove that "she was qualified for her position"). In a more recent decision, *Arnold*

*v. Nursing & Rehabilitation Center at Good Shepherd, LLC*, 471 F.3d 843, 846 (8th Cir. 2006), the Court of Appeals found that the district court erred when it required the plaintiff to "show that she performed her job satisfactorily instead of merely requiring her to show that she was qualified." *Id.* Requiring a plaintiff to prove that she executed her duties satisfactorily at the prima-facie-case stage of the inquiry would "'raise[] the standard set by the Supreme Court for what suffices to show qualification.'" *Id.* (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2nd Cir. 2001)). Therefore, the relevant question is whether Riley was qualified for the employment clerk position at Tyson.

Tyson argues that Riley was not qualified for the position from which she was terminated because the employment clerk position was the first employment-related position Riley had ever held, and she lacked any previous experience in processing employment applications and immigration paperwork and in hiring and recruiting employees. Tyson also points out that Riley lacked any education or formal training in performing clerical duties. (Riley Depo. at 13:21-23; 15:14-24; 127:4-128:5.)

While all of this may be true, the parties point to nothing in the record showing that Riley was not qualified to perform the tasks required for the employment clerk position at Tyson—type, operate a computer, process records, monitor and process lists, file papers, answer telephones, schedule interview appointments, work well with others, and have the abilities to learn and perform tasks with little supervision. (Filing 42, Exs. 16 & 17.) Thus, for purposes of this motion for summary judgment, I shall assume that Riley has established the second element of her prima facie case—that she was qualified for the job.

What Riley has failed to establish is the last element of her prima facie case—that her discharge occurred in circumstances that give rise to an inference of unlawful discrimination based on race or national origin, and that Riley was replaced by a sufficiently younger individual such that age discrimination may be inferred.

18

The undisputed evidence shows that Riley engaged in a continual pattern of mistakes, errors, and unsatisfactory performance which resulted in multiple poor performance evaluations, co-worker complaints, verbal and written counseling, written warnings, suspensions, and eventual termination. There is no evidence of other employees who engaged in misconduct of the same kind, severity, and frequency, but were treated differently. Nor do the parties identify evidence establishing the age of Riley's replacement, if there was one. Bluntly put, the plaintiff has presented subjective beliefs and conclusory allegations with no evidentiary support, leaving the court with no basis whatsoever to infer unlawful discrimination.

Even assuming Riley could establish a prima facie case of discrimination regarding her termination, Tyson has established legitimate, nondiscriminatory reasons for her termination—violation of company policy by accepting an application and maintenance test within 30 days of the applicant's prior test and application, as well as continuous, documented performance problems. Poor job performance and violation of company policy are legitimate, nondiscriminatory reasons for termination from one's employment. *Dammen v. UniMed Medical Ctr.*, 236 F.3d 978, 981 (8th Cir. 2001) (poor job evaluation was one legitimate, nondiscriminatory reason for plaintiff's discharge); *Bogren v. Minnesota*, 236 F.3d 399, 404 (8th Cir. 2000) (among other considerations, poor performance was legitimate, nondiscriminatory reason for plaintiff's termination); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) ("insubordination and violation of company policy are legitimate reasons for termination").

In response to Tyson's proffered nondiscriminatory reasons for her termination, Riley claims that Tyson's reasons are pretextual; that is, that Tyson's reasons are false and that discrimination on account of Riley's race, national origin, or age was the real reason for her discharge.

A plaintiff may make a sufficient showing of pretext by different

19

means, including showing that an employer: (1) failed to follow its own policies, *Ledbetter v. Alltel Corporate Servs., Inc*., 437 F.3d 717 (8th Cir. 2006); (2) treated similarly-situated employees in a disparate manner, *Putman v. Unity Health Sys*., 348 F.3d 732 (8th Cir. 2003); and (3) made substantial changes over time in its proffered reason for an employment decision, *Kobrin v. Univ. of Minn.*, 34 F.3d 698 (8th Cir. 1994), *cert. denied*, 522 U.S. 1113, 118 S. Ct. 1046, 140 L .Ed. 2d 111 (1998).

*Arnold v. Nursing & Rehabilitation Center at Good Shepherd, LLC*, 471 F.3d 843, 847 (8th Cir. 2006).

Riley first alludes to the argument that Tyson failed to follow its own policies when it discharged her for violating company policy related to allowing an applicant to apply for a job more than once within a 30-day period, but Tyson did not discharge the applicant who actually violated the application procedures.  (Filing 42, Pl.'s Br. Opp'n Mot. Summ. J. at 13.)  However, Riley has failed to submit any evidence whatsoever establishing that the applicant has not been demoted, disciplined, or discharged, or suffered other job-related consequences, for his alleged deceit. Further, the court cannot locate—nor have the parties pointed to—evidence of the policy itself or consequences that will occur should an applicant who is later hired violate the policy.  In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'"  *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).

Riley next attempts to prove pretext by arguing—again without submission of any supporting evidence—that she was treated less favorably than similarly situated employees.  For instance, Riley claims she did not have her own office space, as did the Assistant Employment Manager; the "younger girls in the personnel office . . . were free to do as they pleased"; and the Assistant Employment Manager was free to

"do as she pleased, having personal phone calls, having a lot of interaction with her children coming in."  (Riley Depo. at 272:1-274:20.)

"At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one."  *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005).  Riley must "show that she and the employees outside of her protected group were similarly situated in all relevant respects."  *Id.*  This she has not done.  Riley herself acknowledges that her desk placement differed from that of other employees because she was required to meet and greet people from the front office as part of her job. Riley further admits that the "personnel office girls" did not have the same position, job duties, and supervisors as Riley, nor were they in the same office.  Riley also concedes that she cannot identify any errors or mistakes made by the employees to whom Riley compares herself, and she is not aware that the Assistant Employment Manager "was ever talked to or counseled about any performance issues" as Riley was.  (Riley Depo. 129:7-19; 131:3-16; 275:4-276:13; 282:8-11.)

In short, Riley has failed to raise a triable question of material fact as to whether Tyson's legitimate nondiscriminatory reasons for her termination were a pretext for discrimination.  There is absolutely no evidence that Tyson acted because of a discriminatory motive.  To the contrary, the evidence establishes that Tyson's action was taken pursuant to its honest belief, based on extensive documentation, that Riley had violated company policy and had constant and significant performance problems.  Therefore, the defendant's motion for summary judgment (filing 38) must be granted, and this matter should be dismissed.

IT IS ORDERED:

1.      The defendant's motion for summary judgment (filing 38) is granted;

2.    This case is dismissed with prejudice; and

3.    Judgment shall be entered by separate document.

July 3, 2007.

                              BY THE COURT:
                              s/ *Richard G. Kopf*
                              United States District Judge